In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-09-00446-CR


____________________



EX PARTE CHRISTINA GONZALEZ TIJERINA






On Appeal from the 284th District Court 


Montgomery County, Texas


Trial Cause No. 09-09-08764-CV






MEMORANDUM OPINION


 Christina Gonzalez Tijerina (1) appeals the trial court's denial of her application for writ
of habeas corpus in which she sought a reduction of pre-indictment bail. (2) Christina's lone
appellate issue asks whether bail in the amount of $250,000 is excessive in light of the
evidence presented to the trial court. We reverse and render. 

 The complaint alleges Christina committed the felony offense of Injury to a Child,
which apparently resulted from a failure to provide medical care to three year-old, D.L.T. (3) 
Christina, the maternal grandmother of D.L.T., was arrested along with her daughter, Crystal
Tijerina (maternal aunt and admitted caregiver of D.L.T.), and Crystal's common-law
husband, Noah Herrera, who also claimed D.L.T. as his son for their involvement in D.L.T.'s
death. Because of indigency, Christina was appointed counsel by the trial court. Shortly
thereafter, trial counsel filed an application for writ of habeas corpus seeking a reduction of
the $250,000 bail previously set for Christina's release. A hearing was held during which
Christina testified. The State presented no witnesses, but did tender into evidence the type-written complaint from which the arrest warrant for Christina was issued. The trial court
ultimately denied relief and left Christina's bail at $250,000. This appeal followed.

 Bail shall not be excessive. Tex. Const. art. I, § 13. "All prisoners shall be bailable
by sufficient sureties" in non-capital offenses. Tex. Const. art. I, § 11. "'Bail' is the
security given by the accused that he will appear and answer before the proper court the
accusation brought against him, and includes a bail bond or a personal bond." Tex. Code
Crim. Proc. Ann. art. 17.01 (Vernon 2005). The primary purpose of an appearance bond
is to secure the presence of the accused at trial on the offense charged. Ex parte Rodriguez,
595 S.W.2d 549, 550 (Tex. Crim. App. 1980) (citing Ex parte Vasquez, 558 S.W.2d 477, 479
(Tex. Crim. App. 1977)). Bail should be set high enough to give reasonable assurance that
the accused will appear at trial, but it should not operate as an instrument of oppression. 
Tex. Code Crim. Proc. Ann. art. 17.15 (1), (2) (Vernon 2005); Ex parte Ivey, 594 S.W.2d
98, 99 (Tex. Crim. App. 1980) (citing Ex parte Bufkin, 553 S.W.2d 116, 118 (Tex. Crim.
App. 1997)). 

 The burden is on the person seeking the reduction to demonstrate that the bail amount
is excessive. Ex parte Rubac, 611 S.W.2d 848, 849 (Tex. Crim. App. [Panel Op.] 1981); Ex
parte Charlesworth, 600 S.W.2d 316, 317 (Tex. Crim. App. [Panel Op.] 1980). The setting
of bail is committed to the discretion of the trial court, but the exercise of that discretion is
governed by the constitution and by statute. Tex. Code. Crim. Proc. Ann. art. 17.15. 
Additionally, the nature of the offense and the circumstances under which it was committed
are also factors to be considered, along with the future safety of the community and the
victim. Id. art. 17.15 (3), (5). The accused's ability to pay "is to be regarded" along with
evidence submitted to the trial court for its consideration. Id. art. 17.15 (4); Ex parte Gentry,
615 S.W.2d 228, 231 (Tex. Crim. App. 1981).

 In applying these statutory guidelines, the trial court may also consider: "(1) the
accused's work record; (2) the accused's family and community ties; (3) the accused's length
of residency; (4) the accused's prior criminal record; (5) the accused's conformity with
previous bond conditions; (6) the existence of outstanding bonds, if any; and (7) aggravating
circumstances alleged to have been involved in the charged offense." Maldonado v. State,
999 S.W.2d 91, 93 (Tex. App.--Houston [14th Dist.] 1999, pet. ref'd) (citing Ex parte Rubac,
611 S.W.2d at 849-50). 

 The trial court made no findings as part of the ruling. The evidence before the trial
court consisted of Christina's testimony and the written complaint. Her uncontroverted
testimony indicated that she had been a resident of Montgomery County for about eight or
nine years; that she had no prior convictions of any kind; that she was an unemployed, a
widow, living on social security; that she was unable to make a $250,000 bail; that her family
and friends could potentially pool their resources to produce a $5,000 bail bond fee, thus
permitting her to make a bail amount of $50,000; and that she pledged to make all scheduled
court appearances if she were released on bond. The State asked one question on cross-examination: "Do you understand that the allegations are in this case that you, your daughter,
[and] Nolan Herrera, intentionally withheld medical treatment from your grandson, [D.L.T.],
after he sustained life-threatening and actually injuries that caused his death? Do you
understand that those are the allegations?", to which Christina responded, "Well, yeah, I
guess now I do." 

 The complaint indicated that three year-old D.L.T. lived at a Montgomery County
residence along with four adults: Crystal Tijerina, Noah Herrera, Christina Tijerina
(appellant), and Christina's boyfriend, Steven Chauvin. The complaint also describes the
events immediately before and after D.L.T. was taken from his residence to the hospital by
emergency medical services personnel. The document further indicates that D.L.T. was
pronounced dead at the hospital, and that the attending physician noted the child's body
showed signs of multiple bruises to the face, chin, neck, abdomen, hips, and back areas, that
were in various stages of healing. The doctor also related that during his exam, D.L.T.'s
body temperature was checked and found to be 93.5 degrees. This indicated to the doctor
that the deceased child was in the early stages of rigor mortis. 

 The complaint also included the medical examiner's more pertinent findings taken
from the autopsy of D.L.T. the day after his death. These findings included the fact that
D.L.T.'s abdominal cavity was filled with blood; that he had suffered a lacerated or torn
spleen; that he had fractures to five ribs on the right side, and that he had a large sub-scapular
hemorrhage, as well as a lacerated liver, and was hemorrhaging on both sides of the kidneys
and of the thymus and the pancreas. The medical examiner also opined that D.L.T. had likely
been deceased approximately one to two and one-half hours before emergency medical
services personnel were contacted due to his "core temperature, and the beginning stages of
rigor mortis" found by herself and by the hospital's physician. The complaint also provides
an explanation by Christina that D.L.T. had injured himself two days previously when he
unbuckled his seatbelt and fell against the dash-board area while riding in her vehicle. Both
doctors, however, stated that the child's injuries were not consistent with such an
explanation. 

 The complaint's factual allegations do not include any allegation as to the source of
the child's injuries nor who, if anyone, actually inflicted the injuries on the child's body. The
final paragraph of the complaint reads as follows:

 On September 01, 2009, Steve Chauvin was transported to the Montgomery
County Sheriff's Office Criminal Investigation Division, where an audio/video
recorded interview was conducted by Lt. B. Bucks and Detective D. Eason. 
During the interview, Steve told Lt. Bucks that [D.L.T.] needed medical
treatment, but no one made an attempt to secure that treatment due to Christina
telling the adults on location that they could not take [D.L.T.] to the hospital
due to the bruises on [D.L.T.'s] face and an active Texas Department of
Family and Protective Services/CPS investigation. The failure to obtain
medical treatment for [D.L.T.] due to the Texas Department of Family and
Protective Services/CPS investigation was corroborated during the interviews
with Steve Chauvin, Crystal Tijerina, and Noah Herrera.


 It is axiomatic that a probable cause affidavit may be founded entirely on hearsay. See
Hinojosa v. State, 4 S.W.3d 240, 248 (Tex. Crim. App. 1999) (citing Franks v. Delaware,
438 U.S. 154, 165, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)). The evidence before the trial
court consisted of Christina's testimony and the written complaint. No witnesses testified
at the hearing regarding the circumstances surrounding the injuries to the child or the events
leading up to the child's death. In this situation, we take the facts contained in the probable
cause affidavit admitted into evidence without objection as entirely true. Nevertheless, while
the complaint indicates D.L.T. suffered extreme physical abuse which led to his death, it is
much less clear what role the State alleges Tijerina played in the tragedy. See Tex. Pen.
Code Ann. § 22.04 (b) (Vernon Supp. 2009) ("An omission that causes [serious bodily
injury to a child] is conduct constituting an offense [only] if: (1) the actor has a legal or
statutory duty to act; or (2) the actor has assumed care, custody, or control of a child[.] . . ."). 
Also unclear from the facts set out in the complaint is the "on or about" date that Christina
purportedly advised the "adults" to refrain from providing medical assistance to D.L.T., and
at what time did D.L.T.'s injuries or medical condition deteriorate to the point that omitting
medical care amounted to intentionally or knowingly causing him serious bodily injury. See
id. § 22.04 (a)(1). Without an indictment, we cannot know how the State intends to prove
Christina's criminal culpability. 

 Except for the nature and circumstances of Christina's criminal complicity in D.L.T.'s
death, most of the remaining factors seem to be sufficiently shown in the complaint. It was
uncontroverted that Christina could not make bail set at $250,000, but most probably could
secure a bond in the amount of $50,000 with the help of family and friends. Sadly, although
the future safety of the victim is not at issue, reasonable conditions of bail can be required
by the trial court, such as no contact with children of a certain age for community safety
purposes. See Tex. Code Crim. Proc. Ann. art. 17.40 (a) (Vernon Supp. 2009); Ex parte
Anderer, 61 S.W.3d 398, 405-06 (Tex. Crim. App. 2001). Also uncontroverted is the fact
that Christina was unemployed and living on social security income, that she had resided in
Montgomery County for approximately eight or nine years, and that she had no prior criminal
history. 

 The record does not include evidence regarding Christina's comformity with prior
bond conditions, if any, or whether she had other outstanding bonds, nor do we have a clear
picture with regard to any other family she has residing in the community, or, absent an
indictment, the potential punishment range. We can say that if the State indicts Christina for
the offense listed on the face of the complaint, the punishment range would be for a first
degree felony, which, upon conviction, is punishable by confinement in the Texas
Department of Criminal Justice - Correctional Institutions Division for a term ranging from
five years to ninety-nine years or life, and includes the possibility of a fine not to exceed
$10,000. See Tex. Pen. Code Ann. § 12.32 (Vernon Supp. 2009). 

 Unquestionably, the crime for which Christina is accused via the complaint is an
extremely serious one, both upon the alleged facts and with regard to the potential
punishment. Nevertheless, in light of the evidence that was presented to the trial court, and
having assessed the trial court's ruling against the statutory and common law factors
informing the setting of pretrial bail, we find the trial court abused its discretion by
permitting Christina's bail to remain set at $250,000. We reverse the trial court's order and
render judgment that Christina is entitled to the relief sought to the extent that the amount of
her bail is reduced to $50,000, subject to such reasonable terms and conditions as may be
determined by the trial court. 

 REVERSED AND RENDERED. 


 __________________________________

 CHARLES KREGER

 Justice


Submitted on December 14, 2009

Opinion Delivered February 3, 2010

Do not publish


Before McKeithen, C.J., Kreger and Horton, JJ.

DISSENTING OPINION


 I respectfully dissent. While I believe that the amount of the bond that the majority
has chosen is one that is "sufficiently high to give reasonable assurance that the undertaking
will be complied with[,]" the trial court also had the discretion to weigh and consider the
"nature of the offense and the circumstances under which it was committed[.]" See Tex.
Code Crim. Proc. Ann. § 17.15(1), (3) (Vernon 2005). The nature of the offense, as shown
by the complaint, were omissions that caused serious bodily injury to D.L.T., specifically,
his death, in violation of section 22.04(b) of the Texas Penal Code. See Tex. Pen. Code
Ann. § 22.04(b) (Vernon Supp. 2009). There are also facts in the complaint from which the
trial court could reasonably conclude that Christina had assumed D.L.T.'s care, possession,
and control while he was still alive. (4) Finally, the circumstances of this case also reflect that
Christina instructed others to not obtain medical treatment to address D.L.T.'s injuries. Thus,
the facts presented allowed the trial court to conclude that Christina callously failed to take
D.L.T. to the hospital despite his obvious injuries and despite having him in her care,
custody, and control during periods that were relevant to his death. 

 The Legislature directed trial judges to weigh five factors in deciding bail, one of
which allows the trial court to consider the nature of the offense and the circumstances under
which it was committed. See Tex. Code Crim. Proc. Ann. § 17.15 (1)-(5) (Vernon 2005). 
In my opinion, the majority's analysis does not allow the trial court to exercise the discretion
to consider and weigh each of the factors it is allowed to consider by statute. When the
nature and circumstances of the offense are included as factors the trial court could properly
consider, I do not see that the trial court abused its discretion, even if Christina was without
sufficient resources to obtain her release. Additionally, I cannot conclude that the trial court
was obligated to set a bond in the amount that Christina testified that she could afford. I
would affirm the trial court's decision to deny Christina's writ of habeas corpus.


 ____________________________

 HOLLIS HORTON

 Justice


Dissent Delivered

February 3, 2010

1. The record contains documents spelling appellant's name as both "Christina" and
"Cristina."
2. The record does not include a copy of an indictment. Christina was in custody
pursuant to a complaint prepared by Paul Hahs Sr., of the Montgomery County Sheriff's
Office, from which a magistrate issued a warrant for Christina's arrest. On appeal, Christina
does not complain of the lack of probable cause for her continued incarceration. The only
relief prayed for by Christina is a reduction in the amount set for her bail to $50,000.
3. D.L.T. died from injuries he sustained at some time not reflected in the record. 
4. The pertinent part of the complaint states that D.L.T. became ill on August 30; then,
on August 31: "Crystal stated that she took [D.L.T.] to [Christina's] room and asked
[Christina] to look after him while she went to the store to purchase liquids to rehydrate
[D.L.T.]" (emphasis added). The complaint goes on to explain that while D.L.T. was in
Christina's care, he stopped breathing. Christina advised Crystal that D.L.T. needed to go
to the hospital. When the child arrived at the hospital, Christina attributed D.L.T.'s injuries
to a collision with the dashboard of a van, even though the physician indicated that D.L.T.'s
"injuries were not consistent with the story [about] how the injuries occurred." The doctor
that performed D.L.T.'s autopsy suggested that he had been deceased for one to two and one-half hours before the family called for an ambulance.